# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**7134 Araia Drive, Fountain,<br>El Paso County, Colorado.** | )<br>)  Case No.  17-sw-05988-STV<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the ___State and___ District of ___Colorado___, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

**X** Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Michael Simonich*

Michael Simonich, TFO
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: August 1, 2017

City and state: Denver, CO

Scott T. Varholak, U.S. Magistrate Judge
*Judge's signature*
*Printed name and title*

**ATTACHMENT A**

**<u>DESCRIPTION OF LOCATION TO BE SEARCHED</u>**

DESCRIPTION OF PREMESIS TO BE SEARCHED



7134 Araia Drive, Fountain, County of El Paso, State of Colorado, is a one-story single family residence which is tan in color, with a lighted tan colored trim. The front door faces South, and the numbers "7134" are attached to the residence above the garage door.

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

The following items, located within the SUBJECT PREMISES, which constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 21, United States Code, Section 846:

Controlled substances including but not limited to, marijuana, marijuana candy or "edibles" or any derivative thereof, and/or any compound, mixture or preparation which contains any quantity of the controlled substance

United States currency constituting proceeds of the above violation.

Any and all cellular telephones determined to be involved in the illegal distribution of narcotics.

Equipment, vessels and/or implements used in connection with the cultivation, manufacture, production, storage or dispensing of controlled substance

Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to the above violation

Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning communications about the distribution of controlled substances, or the proceeds from the distribution of controlled substances

Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning the distribution of controlled substances, or the proceeds from the distribution of controlled substances

Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the computer or by other means for the purpose of committing violations of the above listed statute

Information or electronic documents relating to records, receipts, bank statements and records, money drafts, letters of credit, money orders, and cashier's checks, passbooks, bank checks, bank deposit tickets, safe deposit boxes, keys, electronic wallets, and other memoranda and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money

Any and all photos or videos that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of the above listed violation

Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to the above listed violations

Any and all information, documents, records, or correspondence, in any format or medium, pertaining to occupancy or ownership of the premises and use or ownership any computer equipment found in the premises

Credit information, bills, and payment records pertaining to the above listed violation

For any computer, computer hard drive, electronic device, or other physical object upon which computer data can be recorded (hereinafter COMPUTER) that is called for by this warrant, or that might contain items otherwise called for by this warrant:

a. evidence of who used or owned the COMPUTER;
b. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;
c. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;
d. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;
e. contextual information necessary to understand the evidence described in this attachment; and
f. volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer.

This warrant does not authorize access to the contents of any computer or other electronic devices seized.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

1. Your affiant, Task Force Officer (TFO) Michael Simonich, Drug Enforcement Administration, being duly sworn, does hereby depose and state the following:

2. This affidavit is submitted in support of an Application for a Federal Search Warrant to search the following locations:

- **SUBJECT PREMISES 1:** A single family residence, to include all exterior buildings, located at 1410 Tamarisk Drive, City of Colorado Springs, County of El Paso, State of Colorado (further described in Attachment A and hereinafter referred to as SUBJECT PREMISES 1), in order to secure evidence of violations of the following statute: Title 21, United States Code, Section 846, Conspiracy to Distribute Controlled Substances.

- **SUBJECT PREMISES 2:** A single family residence, to include all exterior buildings, located at 16175 Degroot Road, City of Colorado Springs, County of El Paso, State of Colorado (further described in Attachment A and hereinafter referred to as SUBJECT PREMISES 2), in order to secure evidence of violations of the following statute: Title 21, United States Code, Section 846, Conspiracy to Distribute Controlled Substances.

- **SUBJECT PREMISES 3:** A single family residence, to include all exterior buildings, located at 7134 Araia Drive, City of Fountain, County of El Paso, State of Colorado (further described in Attachment A and hereinafter referred to as SUBJECT PREMISES 3), in order to secure evidence of violations of the following statute: Title 21, United States Code, Section 846, Conspiracy to Distribute Controlled Substances.

3. Your affiant is currently a Deputized Task Force Officer (TFO) of the United States Drug Enforcement Administration (DEA), has been so assigned since August of 2011, and is employed by the Pueblo, Colorado Police Department. Prior to my assignment to the DEA, your affiant served 17 years as a detective in the Pueblo Police Department Special Investigations Division's Narcotics Unit. Your affiant has been involved in numerous investigations of drug trafficking and has participated in several wiretap investigations. As a result, your affiant is experienced in the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute drugs and the means and methods used to hide profits generated from those transactions. Your affiant has authored several affidavits requesting court authorization to search residences, vehicles, storage units, computers, and cellular telephones. In addition, your affiant's training and experience includes, but is not limited to: conducting surveillance, interviewing witnesses, writing affidavits for and executing search warrants, and utilizing the assistance of undercover agents and informants. Your affiant has participated in investigations of illegal drug related cases through controlled purchases of illegal drugs, surveillance of suspected illegal drug sale operations and analysis of illegal drug related intelligence reports. Your affiant is familiar with many commonly abused illegal drugs, including cocaine, heroin, LSD, marijuana, ecstasy, and methamphetamine. Your affiant has been involved in discussions and interviews with individuals who are involved in the aspects of cultivation, sales, packaging, transferring, manufacturing, and the use of drugs. Your affiant is also familiar with the appearance, common methods of use, manufacturing, distribution, packaging, and concealing of these drugs, as well as

slang terms frequently used to refer to these drugs and things closely related to their use and sale.

4.    Your affiant is an "investigative or law enforcement officer" within the meaning of Title 21, United States Code 878, and Section 2510 (7) of Title 18, United States Code, and is authorized by law to conduct investigations and make arrests for offenses in Title 18, United States Code, Section 2516 and for Controlled Substance Act offenses.

5.    Your affiant has personally participated in this investigation, and makes this Affidavit based on your affiant's personal participation in this investigation and based on reports made to your affiant by other DEA agents and/or law enforcement authorities.

6.    Based on your affiant's experience and training in controlled substance investigations, your affiant is familiar with the cocaine hydrochloride, marijuana, methamphetamine and heroin, and the related materials used to import, manufacture, package, and distribute said controlled substances. In that same capacity, your affiant is familiar with the documents and records commonly maintained by persons who import, manufacture, package, and distribute controlled substances. Your affiant has participated in the execution of search warrants where documents, records, and controlled substances have been located and seized. Your affiant also has experience in debriefing defendants, participant witnesses, informants, and other persons who have personal knowledge of the amassing, spending, converting, transporting, distributing, laundering, and concealing of proceeds of drug trafficking.

7.     Based upon your affiant's experience and training, and further based upon discussions with fellow law enforcement agents with years of personal experience in the area of drug law enforcement, your affiant is aware it is common for illicit drug traffickers:

> a.     to maintain controlled substances within their residences and other buildings on their property, for control and easy access for distribution;
>
> b.     to keep large amounts of U.S. currency in order to maintain and finance their ongoing illicit drug trafficking business;
>
> c.     to keep books, records, receipts, notes, ledgers, airline tickets, bank records, money orders, and other papers relating to the manufacture, importation, transportation, and distribution of illegal controlled substances;
>
> d.     to secrete contraband, precursor chemicals and glassware, proceeds of drug sales, and records of illicit drug transactions in secure locations within their residences, businesses, properties, automobiles, and within rented storage units for ready access and to conceal the same from law enforcement authorities;
>
> e.     to conceal in residences, businesses, properties, automobiles, and rented storage units, caches of drugs, currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in illicit drug trafficking activities;
>
> f.     to amass proceeds from the sale of drugs to attempt to legitimize these profits through foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts;
>
> g.     to keep books, papers, and electronic devices (computers, electronic Rolodexes, caller ID devices, pagers, and cellular telephones) which reflect names, addresses and/or telephone

numbers of their clients and associates in the illicit drug trafficking organization;

h.  to photograph themselves, their associates, their property, their operations, and their controlled substances and to keep these photographs in their possession;

i.  to keep paraphernalia for manufacturing, importing, packaging, weighing, and distributing controlled substances, including but not limited to, glassware, precursor chemicals, scales, plastic bags, and other packaging materials;

j.  to utilize telephones, cellular telephones, digital pagers, utilities, automobiles, motel rooms, apartments, houses, and storage units which have been obtained by third parties (straw purchasers) or in false names to hinder law enforcement investigations and to avoid seizure laws; and

k.  to keep handguns, assault rifles, ammunition, and other weapons in their residences, businesses, automobiles, and storage units to safeguard supplies of drugs and the fruits of crimes.

8.  Further, it has been your affiant's experience that illicit drug traffickers are not unlike any other individuals in our society in that they maintain documents and records. These documents and records will normally be retained for long periods of time regardless of whether their value to the individual has diminished. Often times this type of evidence is generated, maintained, and subsequently forgotten. Hence, individuals keep documents that one would normally think a prudent person would destroy because of their incriminating nature. It is also your affiant's experience that, the larger and more complex a continuing criminal enterprise is, the more documentary evidence is generated. The documentary evidence most commonly seized includes telephone numbers, address books, credit cards and hotel receipts documenting travel, mobile telephone records, accounts and records in fictitious names, carbon copies of money orders and cashier's

5

checks evidencing large cash expenditures, correspondence, and records indicating the existence of storage facilities used in drug trafficking.

9. Finally, your affiant is aware that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41, Fed.R.Crim.P, permits the government to search for and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about crime.

10. The following is not an exhaustive enumeration of the facts that your affiant has learned during the course of this investigation, but are the facts which your affiant believes are sufficient to establish probable cause for the requested search warrant. References to other law enforcement personnel's participation in this case may be referred to generally as "agents" or "investigators."

## PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

11. On May 11th, 2017 at approximately 7:11 PM, Canadian County Sheriff (Oklahoma) Deputy Lang conducted a traffic stop on a black, Honda car, bearing Colorado license plate 582YTL, for a traffic violation near mile marker 109 on Interstate 40. The vehicle was registered to Emanuel CRUZ at 1410 Tamarisk Drive, Colorado Springs, Colorado (Subject Premises 1). Upon contact, Deputy Lang identified the driver

6

via Colorado driver's license and a military identification card as Emanuel CRUZ TORRES. CRUZ TORRES's driver's license lists his address as 4030 Lacy Ln., Apt. 18, Colorado Springs, Colorado. Deputy Lang detected an odor of raw marijuana during his contact with CRUZ TORRES. CRUZ TORRES advised Deputy Lang that he was in Kansas on a type of military leave, and was heading to Colorado Springs where he resides. Deputy Lang knew that this was outside of normal travel for that trip, then asking Torres why he was in Oklahoma. Torres stated he was visiting a friend in Oklahoma City, Oklahoma but could not fully identify his friend or his friends address. CRUZ TORRES consented to a search of his vehicle. During a search of the vehicles trunk, Deputy Lang located a cardboard box for a Black and Decker, clothing Iron. Upon searching the box, Deputy Lang located a large plastic bag containing numerous rolls of currency that was packaged in increments with rubber bands, consistent with previous criminal interdiction stops and seizures of drug proceeds. CRUZ TORRES and his vehicle were detained pending further investigation, and were transported to the Canadian County Garage for a secondary search. During a secondary search of the vehicle, investigators located a large military duffel bag that was empty and a black duffel bag that was empty in the main compartment, and there was no amount of clothes, especially for a travel that CRUZ TORRES had explained. Also located were several notepads and a green ledger book. In the back of the ledger book, Deputy Lang found what appeared to be a currency ledger that listed "Owe me" "you pay me" and "Old stuff". The amounts were $60,500 (You pay me), $40,500 (Owe me), $1,000 (Old Stuff). Investigators found that the currency was bundled separately in denominations of $100 bills, $50 bills, and $20 bills, and the bundles were held together by rubber bands, consistent with how narcotics proceeds are

7

commonly bundled.  The currency was later counted and determined to be $37,861.00 in United States Currency (USC).  During a search of CRUZ TORRES' wallet, investigators found a small flake of marijuana, which was later tested and found to be positive for the presence of marijuana.  Investigators advised CRUZ TORRES that he was under arrest for Possessing/Concealing drug proceeds, and attempted to advise CRUZ TORRES of his Miranda Rights, however, CRUZ TORRES immediately said, "I want a lawyer." Investigators discontinued the interview.

12. On June 30, 2017, your affiant received a report from United States Army Criminal Investigations Command (CIC) Special Agent (SA) Christopher Dowling detailing canvas interviews of associates to CRUZ-TORRES, conducted by Fort Carson CIC.  The report details that on June 27, 2017, at approximately 1:45 PM, CIC SA Christopher Rolando interviewed Private Sania RUIZ-GUZMAN.  During this interview, RUIZ-GUZMAN indicated that she had heard CRUZ-TORRES bragging about money, and that he had three properties, two of which were rented out, and the third was used to grow marijuana.

13. On July 6, 2017, your affiant received a series of telephone calls CRUZ-TORRES made during his incarceration at the Canadian County Jail (208 West Rogers Street, El Reno, Oklahoma) from May 12, 2017, through May 25, 2017, with a female referred to as "Karina."  The calls were placed to phone number 719-243-7173.  It should be noted that telephone calls from this detention facility are subject to being recorded and monitored unless the call is privileged under attorney/client communications, and the callers are advised of this, during the calls.  Therefore, CRUZ-TORRES had no expectation of privacy regarding telephone communications from this detention facility.

14.     Your affiant requested Conduit Language Specialists to translate these calls from Spanish language and provide a synopsis of the calls. Your affiant reviewed the translated calls of CRUZ-TORRES and found the following:

15.     On May 13, 2017, CRUZ-TORRES had a series of telephone calls with a female, identified as Karina. On one call, CRUZ-TORRES asked if Karina had talked to "Rubia", and Karina affirmed, and said she was going to stop by the day after because she needed some "roofing samples", and she (Karina) had told her that she had different colors, but wasn't sure which ones. Karina said Dacia's husband was going to drop off some samples, and the fat guy from last time was also going to drop some other samples off. CRUZ-TORRES wondered why they were going to drop off anything to Karina when they had it already over there [unspecified]. Karina replied that she was going to pick the one she liked, and if they closed that roofing contract, then they would take it next Sunday in the evening. CRUZ-TORRES reminded Karina that he had some in the bedroom. Karina affirmed, and said she had showed her those ones, but she didn't like those colors. CRUZ-TORRES asked about Karina's mom. Karina replied she didn't know where her mom's destination was, or where she was. CRUZ-TORRES told Karina to tell that guy (unknown) that CRUZ-TORRES had already paid for those ones, therefore they had to take off for sure. CRUZ-TORRES added that it was the same kind as last time. CRUZ insisted for third party to take everything and "leave everything clean", and added that they might not know that CRUZ-TORRES had already paid for those ones. Through training and experience, your affiant has learned that roofing materials are commonly purchased from a vendor or roofing contractor where a specific color and style can be selected and ordered, and not through multiple sources to complete an order. Based on

this call, your affiant believes that CRUZ-TORRES and Karina are fully aware that they are on a recorded telephone line, and are speaking in coded language to discuss collecting marijuana samples for distribution on Sunday evening.

16. On May 14, 2017, CRUZ-TORRES and Karina had a series of calls. During this series of calls, Karina asked how much Cortina was charging CRUZ-TORRES for his sample, to which CRUZ-TORRES said it (the sample) was in the red suitcase, and it was fourteen. Karina mentioned that the stuff in the black plastic bag wouldn't take off that day, but it would be sold in Colorado. Karina said that the stuff in the red bag would take off. CRUZ-TORRES asked which one that was, to which Karina replied that it was the one from their home. Karina added that Cortina was bringing about ten more boxes of the roof sample. Karina explained that she didn't like the color, but Rubia liked it and was taking around fifteen boxes of that one, since it would be enough for the whole roof. Karina explained that a third party was supposed to take about 35 boxes because it was for 2 houses, but then it went up to 50 boxes. CRUZ-TORRES said he couldn't pay for that much all at once. Karina said there were two boxes that were Libaldo's, so she could give those ones as a loan. CRUZ-TORRES told Karina to pay fourteen for those ones. Karina said she was told that CRUZ-TORRES had paid fifteen, and it was the same one. Karina said she couldn't explain it because Guajiro was thinking that those ones were leaving to Dallas. Karina said she had asked Cortina for those ten roofing boxes, and CRUZ-TORRES said those were fourteen each. CRUZ-TORRES told Karina to make sure it was well dried. Karina said he had ordered fifteen boxes to Negro, but his price was $1,425. Karina mentioned that so far there were 55 boxes about to take off. CRUZ-TORRES asked how many Libaldo was going to give her, to which Karina replied ten, and

10

ten. CRUZ-TORRES affirmed that is was twenty total. CRUZ-TORRES instructed Karina to tell Libaldo that something happened to CRUZ-TORRES, and they needed to pay for a lawyer. CRUZ-TORRES asked if Libaldo had given Karina $3,000 he owed CRUZ-TORRES, to which Karina negated. CRUZ-TORRES insisted for Karina to ask him for it (money) because she needed to pay that [possible electricity bill] right now. Through training and experience, your affiant believes that CRUZ-TORRES and Karina were discussing the acquisition of marijuana, from Libaldo and other associates, for distribution to Dallas, Texas. Based upon this call, CRUZ-TORRES and Karina continue with coded language discussing roofing supplies; however, there is no purpose in drying roofing supplies or storing them in black plastic bags or suitcases. Investigators believe that within the coded language between CRUZ-TORRES and Karina, they are discussing pounds of marijuana when they are referring to samples or boxes. Also based on training and experience, your affiant believes that within the coded language between CRUZ-TORRES and Karina, they are discussing prices of marijuana when they are referring to fourteen, fifteen, or 1,425, which is consistent with Colorado wholesale marijuana prices of $1,400, $1,500, and $1,425 per pound of marijuana.

17.     On May 14, 2017, during another call between CRUZ-TORRES and Karina, Karina told a third party in the background to multiply fifteen times 1,425, then said it was 21,375. CRUZ-TORRES told Karina not to mention exact numbers. CRUZ-TORRES told Karina to tell the white girl to talk to Rubia and take around 40. Karina told CRUZ-TORRES to stop talking. Based on this call and your affiants training and experience, your affiant believes that CRUZ-TORRES and Karina were brokering the sale of fifteen pounds of marijuana for $21,375.00 at a price of $1,425 per pound, and both CRUZ-

11

TORRES and Karina are fully aware that their conversations are recorded and caution each other to stop talking and to not mention exact numbers.

18.     On May 15, 2017, CRUZ-TORRES and Karina shared a series of calls, where Karina said she would call Libaldo and have him pay the light bill for the farm, and CRUZ-TORRES explained that it was two days late already and the bill was more than $3,000.00.  Karina also informed CRUZ-TORRES that she gave her name as Ingrid Cortez to CRUZ-TORRES' commander.  CRUZ-TORRES again asked Karina about the electric bill, to which Karina said that Libaldo had paid the bill, and it was approximately $1,000.00.  CRUZ-TORRES negated, and advised that Libaldo hadn't paid the other [bill] and it was approximately $3,000.00.  Karina advised that she would call tomorrow for the information, to which CRUZ-TORRES provided his social security number and the address of 16175 Degroot Road, (SUBJECT PREMISES 2) and added that she would be asked for that information.  Based upon this series of calls, investigators believe that CRUZ-TORRES was directing Karina to meet with Libaldo, and pay the electrical bill for 16175 Degroot Road.

19.     Your affiant search County Assessors information and found that CRUZ-TORRES is the owner of 1410 Tamarisk Drive, Colorado Springs, Colorado, (SUBJECT PREMISES 1) and 7134 Araia Drive, Fountain, Colorado (SUBJECT PREMISES 3). CRUZ-TORRES purchased 1410 Tamarisk Drive in December of 2014, and 7134 Araia Drive in September of 2016.

20.     Through your affiant's education and experience, your affiant has learned that the average residential electrical usage is generally between 200-700 Kilowatts per hour (KWH).  In arriving at the approximations below, agents used 2,000 KWH as a

baseline, in order to account for any possible significantly out-of-the-ordinary usage, on some particularly electricity-heavy uses. Accordingly, if a property is reflected as twice normal, that is actually reflecting twice what extremely heavy use would look like, and is actually many times greater than the actual average usage.

21. Agents obtained electrical utility records for the SUBJECT PREMISES, via administrative subpoenas, and verified the following information:

   a. **Utilities for SUBJECT PREMISES 1:** Electrical utilities for 1410 Tamarisk Drive, Colorado Springs, Colorado, are currently under Karina DE LA VILLA with telephone number 719-243-7173 and account number 2553704335. This is the same phone number which CRUZ-TORRES called on the recorded jail calls detailed above. Investigators also found that from June 5, 2017 through July 5, 2017, the electrical usage for 1410 Tamarisk Drive, Colorado Springs, Colorado was 8,494 KWH, which is approximately four times higher than other houses of similar size and structure, consistent with marijuana cultivation. Based upon utility usage, investigators believe that Karina DE LA VILLA is maintaining a marijuana grow at 1410 Tamarisk Drive, Colorado Springs, Colorado, on behalf of the DTO.

   b. **Utilities for SUBJECT PREMISES 2:** Electrical utilities for 16175 Degroot Road, Colorado Springs, Colorado, are currently under Libaldo HORTA with telephone number 719-209-2538 and customer number 189552. Investigators also found that the electrical usage for 16175 Degroot Road, Colorado Springs, Colorado, between May 23, 2017, and

13

June 26, 2017, was 22,217 KWH, which is approximately eleven times higher than other houses of similar size and structure, consistent with marijuana cultivation. Based upon utility usage, investigators believe that Libaldo HORTA is maintaining a marijuana grow at 16175 Degroot Road, Colorado Springs, Colorado, on behalf of the DTO.

c. **Utilities for SUBJECT PREMISES 3:** Electrical utilities for 7134 Araia Drive, Fountain, Colorado, are currently under Emanuel CRUZ-TORRES with account number 10002832-07. Investigators also found that the electrical usage for 7134 Araia Drive, Fountain, Colorado, between May 15, 2017, and June, 15, 2017, was 1,780 KWH, which is higher than the average for other houses of similar size and structure, consistent with marijuana cultivation. Also, between April 14, 2017, and May, 15, 2017, the electrical usage was 3,696 KWH. Based upon utility usage, investigators believe that CRUZ-TORRES is maintaining a marijuana grow at 7134 Araia Drive, Fountain, Colorado, on behalf of the DTO.

22. Investigators searched law enforcement indices and found that on June 24, 2016, Junction City (Kansas) Police K-9 Officer Nicholas Blake stopped a 2016 Hyundai Santa Fe for a traffic violation near mile marker 314 on interstate 70. The driver of the vehicle was identified via Colorado Driver's license as Libaldo LEON-HORTA, with an address of 1410 Tamarisk Drive, Colorado Springs, Colorado (SUBJECT PREMISES 1). Officers deployed a certified K-9 on the vehicle driven by LEON-HORTA, and after receiving a positive alert for drugs, officers conducted a probable cause search of the vehicle and found approximately 34 pounds of marijuana concealed in two large duffle

14

bags on the floor behind the front seats. Officers verbally advised LEON-HORTA of his rights per Miranda, and LEON-HORTA indicated that he understood his rights and elected to speak with investigators without counsel. Under advisement, LEON-HORTA indicated that the marijuana was his, and that he grew it at his house. LEON-HORTA indicated that he was taking the marijuana to a gas station in Louisville, Kentucky, where he was going to meet a buyer. LEON-HORTA indicated that he was planning on selling the marijuana for $21,000.00. Based upon LEON-HORTA's association to 1410 Tamarisk Drive, and the electrical utilities for 16175 Degroot Road being under the name of Libaldo HORTA, investigators believe that Libaldo HORTA and Libaldo LEON-HORTA are the same person, and LEON-HORTA is associated to CRUZ-TORRES and Karina DE LA VILLA, and all three parties are involved in the illicit cultivation of marijuana in Colorado, and distribution of marijuana outside the boundaries of Colorado.

23. Through training and experience, your affiant has learned that marijuana growers routinely stay in a given location for extended periods of time. Your affiant has learned that marijuana grows are routinely equipped to power high output lights, ballasts, fans, filters, timing systems, air conditioners, pumps, carbon dioxide generators, and sometimes irrigation systems, most of which are expensive to install. Most of the systems are routinely installed into the structures, which would make these systems virtually immobile, and they are rarely removed from the structures. Marijuana growers routinely stay at grow locations location for extended periods of time, to avoid the removal of these complex systems, and will only consider relocation if law enforcement is detected.

## CONCLUSION

24.     Based upon the information set forth above, your affiant respectfully submits that there is probable cause that inside the SUBJECT PREMISES, and in any exterior buildings on the properties, will be evidence, fruits, and instrumentalities of crimes, namely violation of Title 21, United States Code, Section 846, Conspiracy to Distribute Controlled Substances, and requests the Court issue a warrant to search for items listed in Attachment B.

25.     I, Michael Simonich, a Task Force Officer with the Drug Enforcement Administration, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief

*s/ Michael Simonich*_____
Michael Simonich, Task Force Officer
Drug Enforcement Administration

Submitted, attested to, and acknowledged by reliable electronic means on the 1st day of August, 2017.

_____
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

This Application and Affidavit was reviewed and submitted by AUSA Garreth Winstead